IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| MITCHELL REPAIR INFORMATION COMPANY, LLC, d/b/a MITCHELL 1 | ) ) ) | |
| *Plaintiff,* | ) ) | C.A. No. |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| NOREGON SYSTEMS, INC., | ) ) | |
| *Defendant.* | ) ) ) | |

## COMPLAINT

Plaintiff Mitchell Repair Information Company, LLC ("Mitchell"), for its Complaint

against Defendant Noregon Systems, Inc. ("Noregon"), alleges as follows:

## THE PARTIES

1.      Mitchell is a limited liability company organized under the laws of the state of

Delaware with its principal place of business at 14145 Danielson Street, Poway, California

92064.

2.      On information and belief, Noregon is a corporation organized under the laws of

the state of North Carolina with its principal place of business at 7009 Albert Pick Road,

Greensboro, North Carolina 27409-9654.

## JURISDICTION AND VENUE

3.      This is a complaint for direct and contributory patent infringement arising under

35 U.S.C. § 271 *et seq.*, and also for breach of contract, false advertising under the Lanham Act

§ 1125(a), unfair competition under N.C. Gen. Stat § 75-1.1 *et seq.*, common law unfair

competition and misappropriation, and tortious interference with a contract.  This Court has

subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), and 1367.

4.      Venue is proper in this District under 28 U.S.C. § 1400(b) because Noregon is a North Carolina corporation and therefore "resides" in this District under 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b), and because Noregon has committed acts of infringement in this District, directly and/or through a third-party, because it manufacturers, makes, imports, sells, offers to sell or use various vehicle diagnostic systems, devices, products, and service, including the JPRO Professional Diagnostic Software with Next Step, within this judicial District, and maintains its principal place of business in this District, which is a regular and established place of business. Furthermore, Noregon engaged in tortious conduct directed to harm residents of this District and has purposefully directed its activities to the State and this District and/or purposefully availed itself of this jurisdiction.

## THE PATENT-IN-SUIT

5.      The patent at issue in this action is United States Patent No. 8,954,222 ("the '222 Patent" or "the Patent-in-Suit").

6.      The '222 Patent is entitled "Method and System for Retrieving Diagnostic Information," and issued on February 10, 2015.  Mitchell owns by assignment the entire right, title, and interest in and to the '222 Patent.  A true and correct copy of the '222 Patent is attached to this Complaint as Exhibit A.

7.      The '222 Patent relates to a system, method and apparatus for retrieving diagnostic trouble codes from a vehicle and providing diagnostic and repair information corresponding and specific to the diagnostic trouble codes for display to a repair technician.  The diagnostic and repair information may be stored locally prior to display.

## BACKGROUND

8.  Mitchell is a leading provider of diagnostic software and repair information to the automotive and commercial trucking industries.  Mitchell operates under the trade name "Mitchell 1" and is sometimes referred to as "Mitchell1".

9.  Mitchell provides diagnostic and repair software and associated software services to thousands of automotive service and repair facilities in the U.S. and Canada, covering passenger vehicles and all classes of commercial trucks.  Commercial trucks range from light trucks (classes 1-3) and medium trucks (classes 4-6) to heavy-duty trucks (classes 7-8).

10. In 2012, Mitchell launched its patented REPAIR-CONNECT system, an internet-based diagnostic and troubleshooting software system for medium and heavy commercial trucks covering most of the makes and models sold in the U.S. and Canada since 1990.

11. Mitchell invested significant time and resources to develop the REPAIR-CONNECT system.  Rather than finding diagnostic and repair information in lengthy repair manuals from each original equipment manufacturer, Mitchell's REPAIR-CONNECT system allows automotive technicians or repair facilities to quickly access relevant and applicable diagnostic and repair information, and to return specific information to facilitate repair, including descriptions, diagnostic trouble codes, related wiring diagrams, component connector views, electrical component locator, testing procedures, removal and installation procedures, and specifications related to the diagnostic trouble code by using vehicle identification information and diagnostic trouble codes.

12. Mitchell obtained the '222 patent to protect its proprietary REPAIR-CONNECT system.

13. Mitchell's patented REPAIR-CONNECT system enjoyed immediate success and acceptance in the market.  The REPAIR-CONNECT system quickly became the leading

3

diagnostic and repair system of its kind.

14.     From its launch, Mitchell has required each user of its REPAIR-CONNECT system to enter into an end user license agreement ("EULA") that governs the terms of use of the system.  End users of Mitchell's REPAIR-CONNECT system agree and acknowledge that breach of the EULA will cause irreparable injury to Mitchell.

15.     Following the successful market launch of its REPAIR-CONNECT system, Mitchell also partnered with other companies to license use of its patented REPAIR-CONNECT system for use with vehicle diagnostic scanning tools.

16.     On March 1, 2012, Mitchell entered into a Service Information Access Agreement ("SIA Agreement I") with Noregon to develop the software and interface required to enable Noregon's JPRO diagnostic scanning tool to work with Mitchell 's REPAIR-CONNECT system for medium-duty and heavy-duty commercial trucks.  Noregon's diagnostic scan tools would allow end users, including repair technicians and repair shops for commercial trucks, to access vehicle diagnostic trouble codes, and Mitchell's REPAIR-CONNECT system would provide specific and tailored diagnostic information and repair instructions corresponding to the diagnostic trouble codes for a particular truck.

17.     Mitchell invested substantial resources in training employees at Noregon related to the use of JPRO with Mitchell's REPAIR-CONNECT system, including training employees at Noregon's call centers on how to answer questions from end users.

18.     Mitchell also invested substantial resources over the course of many months to develop a user interface that enabled Noregon's JPRO diagnostic tool to be used with Mitchell's REPAIR-CONNECT system.

4

19.     On July 20, 2015, Mitchell and Noregon extended their relationship with another Service Information Access Agreement ("SIA Agreement II" or "SIA Agreement") again memorializing their agreement to work together to develop the software and interface required to enable Noregon's JPRO diagnostic scanning tool to be used with Mitchell's REPAIR-CONNECT system for medium-duty and heavy-duty commercial trucks.

20.     Under the SIA Agreement, end users would execute both (1) Noregon's customer agreement providing on-line access from the JPRO diagnostic tool to Mitchell's REPAIR-CONNECT system, and (2) Mitchell's EULA governing use and licensing of Mitchell's REPAIR-CONNECT system.  End users paid Noregon a subscription fee for access to the REPAIR-CONNECT system, and Noregon paid Mitchell a monthly fee for each subscription to its proprietary REPAIR-CONNECT system.  The SIA Agreement also required Noregon to send Mitchell monthly Device Reports indicating the number of active users and fees to be paid.

21.     While Mitchell granted Noregon a non-exclusive license to both use and grant end-users access to Mitchell's REPAIR-CONNECT system, Mitchell was also concerned about misappropriation of its proprietary system.  In order to guard against any such misappropriation, the SIA Agreement prevented certain Noregon "prohibited acts," including directly or indirectly (i) altering or copying, in any form or medium all or any part of the data contained in the Mitchell's REPAIR-CONNECT system; or (ii) reverse engineering, creating any derivative work from, or adaptation of the REPAIR-CONNECT system.

22.     Noregon was also prohibited from accessing Mitchell's REPAIR-CONNECT system by any manner except by use of the JPRO diagnostic tool.

23.     The SIA Agreement also prohibited Noregon from disclosing any of Mitchell's proprietary information to anyone other than (i) its employees, agents, or representatives who

5

reasonably require such knowledge in order to implement the purposes of the SIA Agreement. The SIA Agreement acknowledged that such disclosure would cause the aggrieved party irreparable injury for which there are inadequate remedies at law, and, therefore, the aggrieved party shall be entitled to seek to obtain injunctive or other equitable relief, in addition to other available remedies.

24. Both SIA Agreements I and II spanned three years, with the second Agreement's term spanning from March 1, 2015 to February 28, 2018, with termination possible upon ninety (90) days-notice to the other party.

25. To access Mitchell's REPAIR-CONNECT system, an end user would select a tab entitled "NextStep" or "Next Step Net" (collectively referred to as the "NextStep" tab) in the JPRO diagnostic tool's user interface.

26. End users of JPRO with the REPAIR-CONNECT system had grown to expect to obtain the benefits and efficiencies of using Mitchell's leading REPAIR-CONNECT system when they selected the "NextStep" tab in the JPRO tool's user interface.

27. In September of 2017, Noregon informed Mitchell that it intended to cancel the SIA Agreement within sixty (60) days.

28. Upon information and belief, at the time, there were about 3000 customers using JPRO with the REPAIR-CONNECT system.

29. Mitchell did not know that prior to issuing its notice to terminate the Agreement, Noregon had developed its own derivation and adaptation of Mitchell's REPAIR-CONNECT system known as the NextStep Service and Repair system, or the NextStep Net Service and Repair system when sold as a stand-alone version of the Next Step Service and Repair system (collectively referred to as the "Next Step" system). Much like the REPAIR-CONNECT system,

6

an end user could access the Next Step system through an interface with a diagnostic tool using vehicle identification information and a diagnostic trouble code.

30.     In October 2017, Noregon announced a so-called "software update" to the end users of JPRO and to the public via a press release.  As part of the software update, Noregon substituted its Next Step system for Mitchell's REPAIR-CONNECT system.  End users who selected the "NextStep" tab in the JPRO user interface no longer accessed and connected to Mitchell's REPAIR-CONNECT system, but rather to Noregon's own infringing Next Step system, which provided less information and less coverage for medium and heavy commercial trucks sold in the U.S. and Canada from 1990 to present.

31.     Upon information and belief, Noregon did not inform end users, all of whom signed a EULA with Mitchell, of the change from Mitchell's proprietary REPAIR-CONNECT system to Noregon's Next Step system.  Rather, Noregon intentionally concealed the switch from Mitchell's REPAIR-CONNECT licensees, and instead falsely and improperly represented the switch as a software update.

32.     Noregon's Next Step system was not only similar to Mitchell s REPAIR-CONNECT system functionally, but the Next Step system also included many of the same user interface features derived and adapted from Mitchell's proprietary REPAIR-CONNECT system, including vehicle and engine selection tabs and drop-down features, trouble code modules, fault code lists, information tabs specific to fault codes, fault code descriptions, wiring, connectors, testing and trouble-shooting, and removal and installation instructions.

33.     Noregon's Next Step system competes directly with Mitchell's REPAIR-CONNECT system.  Noregon markets and sells its JPRO system with Next Step to Mitchell's customers.

34.     On information and belief, Noregon disclosed Mitchell's proprietary information to one or more persons who worked to develop Noregon's competing Next Step system.

35.     Noregon's switch of diagnostic and repair systems, and misrepresentation of the switch as a software update, confused end users as to the identity and source of the diagnostic and repair system.  Multiple end users contacted Mitchell regarding the diminished capabilities of the Next Step system.

36.     Noregon switched each end user of JPRO and Mitchell's REPAIR-CONNECT system, each of whom signed a EULA agreement to use Mitchell's REPAIR-CONNECT system, to the Next Step system.

37.     Noregon stopped paying Mitchell royalties based on the SIA Agreement in October 2017.  Noregon did not submit any further Device Reports to Mitchell.

38.     After Noregon's switch from Mitchell's REPAIR-CONNECT system to its infringing Next Step system in October 2017, Mitchell suffered a loss of customers and revenue.

39.     On information and belief, Noregon markets and sells its JPRO diagnostic tool, interface, and Next Step system not only on its website and in its product literature directed to residents of the Middle District of North Carolina, but also through dealers and/or distributors located in the Middle District of North Carolina.

40.     When it learned about Noregon's JPRO/Next Step system, Mitchell sent a letter to Noregon on February 5, 2018 offering Noregon a license under the '222 patent.  Noregon declined the license, but instead continues to knowingly use, sell and offer for sale its Next Step system, both by itself and in combination with JPRO.

## COUNT I
## DIRECT INFRINGEMENT OF THE '222 PATENT

41.     Mitchell repeats each and every allegation of the preceding paragraphs as if set

8

forth fully herein.

42.     In violation of 35 U.S.C. § 271, Noregon has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claim 6 of the '222 Patent by making, using, selling, or offering for sale within the United States, or importing into the United States, vehicle diagnostic systems that are covered by one or more claims of the '222 Patent, including but not limited to the JPRO/Next Step system.

43.     The JPRO/Next Step system comprises a diagnostic system for retrieving and storing specific diagnostic information.  Below is a photo of the JPRO/Next Step system.



44.     The JPRO/Next Step system comprises a computing device at a first location having a first electronic storage medium.  The JPRO/Next Step system includes a laptop computer that runs the JPRO diagnostic software, including access to the Next Step portal service.  The laptop computer includes a hard drive and memory for electronic storage of information.  The JPRO/Next Step system can used with other laptop and desktop computers as well.

45.     The JPRO/Next Step system comprises a first interface, connected to the computing device, for retrieving one or more diagnostic trouble codes from a second electronic

9

storage medium within a motor vehicle under diagnosis. The JPRO/Next Step system includes a DLA+ 2.0 adapter interface between the laptop and the vehicle input connections to retrieve diagnostic codes from the vehicle's onboard computer.

46.     The JPRO/Next Step system comprises a second interface for connecting the computing device with a remote computing system at a second location via a network connection. The JPRO/Next Step system accesses the Next Step portal from the JPRO or other laptop or personal computer connected to the Internet. Next Step includes searchable databases, including detailed fault information, wiring diagrams, and component locaters.

47.     The computing device in the JPRO/Next Step system includes a display configured to display an index to specific diagnostic information received from the remote computing system. The JPRO/Next Step system laptop (or other laptop or personal computer used in the system), includes a display screen for displaying a list of fault codes (diagnostic trouble codes) received from a vehicle, and displays information about the fault codes received from the Next Step portal.

48.     The computing device in the JPRO/Next Step system is configured to, after retrieval of a first diagnostic trouble code (DTC) from the motor vehicle, [1] request, from an electronic library at the remote computing system, specific diagnostic information tagged with a trouble code identification ID corresponding to the first DTC, [2] receive the specific diagnostic information requested from the remote computing system, [3] store the received specific diagnostic information in the first electronic storage medium, and [4] populate the display of the computing device with an index to the specific diagnostic information tagged with the trouble code identification ID corresponding to the first DTC stored in the first electronic storage medium of the computing device. After retrieving a DTC, the JPRO/Next Step laptop (or other

10

laptop or personal computer) [1] requests and [2] receives from the Next Step portal information corresponding to the DTC, and that information is [3] stored and [4] displayed by the JPRO laptop.

49. The JPRO/Next Step advertising materials explain that "Next Step integrates directly with JPRO" with respect to "data related to fault repair" so that the user can "view fault data" without "constantly switching between application." This occurs when, after receiving the DTC, the JPRO laptop [1] requests and [2] receives information corresponding to the DTC from the Next Step portal, and that information is [3] stored and [4] displayed by the JPRO laptop.

50. In the JPRO/Next Step system, the index to the specific diagnostic information populating the display includes at least a first button selectable to display first specific diagnostic information tagged with the trouble code identification ID corresponding to the first DTC, and a second button selectable to display second specific diagnostic information tagged with the trouble code identification ID corresponding to the first DTC.

51. The JPRO/Next Step system includes a first button, such as "OVERVIEW," and second button, such as "WIRING," "TROUBLESHOOTING TASKS," or "R&I" as navigation tabs within the graphical user interface (GUI), where the selecting the button prompts the GUI to display the respective specific diagnostic information corresponding to the DTC.

52. In the JPRO/Next Step system, the second specific diagnostic information is different than the first specific diagnostic information. The JPRO/Next Step system's second specific diagnostic information (i.e. "WIRING") is different from the first specific diagnostic information (i.e. "OVERVIEW").

53. As a direct and proximate consequence of the infringement, Mitchell has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured

11

in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, including lost profits, but in no event less than a reasonable royalty.

54.     Noregon's infringement is further causing and will continue to cause Mitchell irreparable harm, for which there is no adequate remedy at law.  Unless and until enjoined by this Court, Noregon will continue to infringe the '222 Patent.  Under 35 U.S.C. § 283, Mitchell is entitled to an injunction against further infringement.

55.     Additionally, on information and belief, Noregon has known that its activities concerning JPRO/Next Step system infringe at least claim 6 of the '222 patent.

56.     On information and belief, Noregon has made no attempt to design around the '222 patent.

57.     On information and belief, Noregon's infringement of at least one claim of the '222 patent has been willful.  Mitchell has been damaged as the result of Noregon's willful infringement, and seeks increased damages, up to and including treble damages.

## COUNT II
## INDIRECT INFRINGEMENT OF THE '222 PATENT

58.     Mitchell repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

59.     Noregon also offers for sale and/or sells its Next Step system for use independent of JPRO, including for use alone or with diagnostic tools and software.

60.     Noregon has indirectly infringed at least claim 6 of the '222 patent by inducing others, including its customers, Mitchell's customers and other end users of Next Step, to

12

directly infringe claim 6 by making, selling or offering to sell diagnostic and repair systems using the Next Step system recited in at least claim 6 of the '222 patent.

61.     On information and belief, Noregon intentionally took actions that induced its customers, Mitchell's customers and other end users of Next Step to infringe at least claim 6 of the '222 patent based upon marketing material from and website content of Noregon.  For example, Noregon offered the Next Step system to customers independent of its JPRO diagnostic tools, with knowledge that such use of Next Step would infringe at least claim 6 of the '222 patent.

62.     Noregon has known of the '222 patent since at least February 5, 2018, and has induced infringement since at least that time.

63.     Noregon's actions demonstrate an intent to cause the acts that form the basis of the direct infringement, and that Noregon did so with the specific intent to infringe the '222 patent.

64.     Noregon has also contributed to the infringement of at least claim 6 of the '222 patent by others, including its customers, Mitchell's customers and other end users of Next Step, that directly infringe claim 6, by making, selling or offering to sell diagnostic and repair systems using the Next Step system recited in at least claim 6 of the '222 patent.  For example, Noregon's customers and/or the end users have incorporated Next Step into their diagnostic and repair systems to repair commercial trucks.

65.     Noregon has contributorily infringed and is a contributory infringer because, with knowledge of the '222 Patent, it supplies with Next Step a material part of a claimed combination, where the Next Step is not a staple article of commerce, and has no substantial non-infringing uses.

13

66. Noregon knew that its Next Step system was especially made or adapted for use in a manner that would infringe at least claim 6 of the '222 patent.

67. Mitchell has been damaged as the result of Noregon's indirect infringement, and is entitled to relief under 35 U.S.C. §§ 283 and 284 based on Noregon's induced and/or contributory infringement.

## COUNT III
## BREACH OF CONTRACT

68. Mitchell repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

69. The SIA Agreement between Mitchell and Noregon was entered into for good and valuable consideration.

70. The SIA Agreement between Mitchell 1 and Noregon prohibits Noregon from reverse engineering, creating any derivative works from or adaptations of Mitchell's REPAIR-CONNECT system.

71. Noregon's Next Step system is a derivative work and an adaptation of Mitchell's REPAIR-CONNECT system in violation of the SIA Agreement, including paragraph 2.2.

72. On information and belief, Noregon disclosed Proprietary Information to persons outside of the scope of the SIA Agreement in violation of at least paragraph 5.2.

73. Noregon failed to submit Payments and Device Reports to Mitchell in violation of the SIA Agreement, including paragraphs 6.1 and 6.2.

74. Noregon's breach of the SIA Agreement has caused Mitchell to suffer damages in the form of lost customers, lost market share and lost revenue.

75. Noregon has been unjustly enriched as a result of its breach of the SIA Agreement.

14

76.     Mitchell is entitled to relief in the form of lost profits and lost licensing fees, both in the past and going forward.

77.     Noregon's breach of the SIA Agreement has been willful and malicious.  To the extent permitted under law, Mitchell seeks enhanced damages for Noregon's willful and wanton breach of the SIA Agreement.

### COUNT IV
### VIOLATION OF THE LANHAM ACT –
### FALSE ADVERTISING AND UNFAIR COMPETITION

78.     Mitchell repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

79.     In violation of 15 U.S.C. § 1125(a), Noregon, with the intent to deceive the public, has switched the diagnostic and repair software used with the JPRO diagnostic tool without informing Mitchell's REPAIR-CONNECT customers, licensees or the public of the substitution to a different, inferior product that has fewer capabilities than Mitchell's REPAIR-CONNECT system.

80.     Noregon falsely represented and/or falsely advertised its switch from Mitchell's REPAIR-CONNECT system to Noregon's Next Step system as a software update, when it was a switch to a different system with different software.

81.     Noregon's false representations and/or false advertising have been made in communications to Mitchell's customers, in Noregon press releases, in Noregon's advertising materials and on Noregon's website.

82.     Noregon's Next Step system competes directly with Mitchell's REPAIR-CONNECT system.

15

83.     On information and belief, Noregon misrepresented and falsely advertised the switch from Mitchell's REPAIR-CONNECT system to Noregon's Next Step system as a software update knowingly with the intent to gain a competitive advantage over Mitchell and gain market share away from Mitchell in the market for commercial truck diagnostic services and repair.

84.     Mitchell has suffered commercial harm as a result of Noregon's misrepresentations and false advertising because Noregon's misrepresentations and false advertising are material and likely to confuse customers and potential customers as to the source of the diagnostic and repair software used with JPRO, and lead customers and potential customers to believe that they are using Mitchell's REPAIR-CONNECT system with a software update, not another diagnostic and repair software system marketed and sold competitively against Mitchell's REPAIR-CONNECT system.

85.     Mitchell is entitled to recover damages adequate to compensate it for the competitive injury resulting from Noregon's misrepresentations and false advertising, which damages include at least lost profits.

86.     On information and belief, Noregon has profited from its false advertising of JPRO/Next Step in amounts to be determined in the course of this action.

87.     Pursuant to 15 U.S.C. § 1117, Mitchell is entitled to recover Noregon's profits resulting from Noregon's false advertising of the alleged features of the JPRO/Next Step system.

88.     Noregon's false advertising has further caused and will continue to cause irreparable harm to Mitchell, for which there is no adequate remedy at law, unless and until Noregon is enjoined by this Court from any further false advertising of the JPRO/Next Step system.

16

89. On information and belief, Noregon's above actions are willful and intentional, thus entitling Mitchell to an award of exemplary and enhanced damages in an amount appropriate to punish Noregon and deter others from engaging in similar misconduct.

**COUNT V**
**COMMON LAW UNFAIR COMPETITION**

90. Mitchell repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

91. Noregon, with the intent to deceive the public, switched the diagnostic and repair software used with the JPRO diagnostic tool without informing Mitchell's REPAIR-CONNECT customers, potential customers, licensees or the public of the switch to a different product than Mitchell's REPAIR-CONNECT system.

92. Noregon has competed unfairly with Mitchell by falsely advertising and falsely representing and its switch from Mitchell's REPAIR-CONNECT system to Noregon's Next Step system as a software update, when it was a switch to a different system with different software.

93. Noregon's false advertising and commercial misrepresentations have been made in communications to Mitchell's customers, in Noregon press releases, in Noregon's advertising materials and on Noregon's website.

94. On information and belief, Noregon misrepresented the switch from Mitchell's REPAIR-CONNECT system to Noregon's Next Step system knowingly and with the intent to gain a competitive advantage over Mitchell and compete unfairly against Mitchell in the market for automotive service and repair software.

95. Mitchell has suffered commercial harm as a result of Noregon's unfair competition because Noregon's false advertising and misrepresentations have caused Mitchell's

REPAIR-CONNECT customers, potential customers and licensees to switch to Noregon's Next Step system.

96.    Mitchell is entitled to recover damages adequate to compensate it for the competitive injury resulting from Noregon's unfair competition, which damages include at least lost profits.

97.    On information and belief, Noregon has profited from its acts of unfair competition in falsely advertising and misrepresenting the switch from REPAIR-CONNECT to Next Step in amounts to be determined in the course of this action.

98.    Mitchell is entitled to recover Noregon's profits resulting from Noregon's unfair competition.

99.    Noregon's unfair competition has further caused and will continue to cause irreparable harm to Mitchell, for which there is no adequate remedy at law, unless and until Noregon is enjoined by this Court from unfairly competing with its JPRO/Next Step system.

100.    On information and belief, Noregon's above acts of unfair competition are willful and intentional, thus entitling Mitchell to an award of exemplary and enhanced damages in an amount appropriate to punish Noregon and deter others from engaging in similar misconduct.

**COUNT VI**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**
**UNDER N.C. GEN. STAT. § 75-1.1 *ET SEQ.***

101.    Mitchell repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

102.    Noregon committed an act of unfair and deceptive trade practice by switching the diagnostic and repair software used with the JPRO diagnostic tool from Mitchell's REPAIR-CONNECT system to Noregon's Next Step system, and falsely representing the switch from

Mitchell's REPAIR-CONNECT system to Noregon's Next Step system as a software update, when the switch was to a different system with different software.

103.     Noregon committed the unfair and deceptive trade practices without informing Mitchell's REPAIR-CONNECT customers, potential customers, licensees or the public of the switch to a different product than Mitchell's REPAIR-CONNECT system.

104.     Noregon's conduct involved the business activity of purchasing and licensing automotive diagnostic and repair software and systems, and was in commerce and affected commerce in the state of North Carolina and interstate commerce.

105.     Noregon's conduct adversely and substantially affected the business, operations, sales, and profits of Mitchell.

106.     Mitchell suffered injury due to Noregon's conduct due to loss of customers, loss of market share, and lost profit.

107.     Noregon's conduct was the proximate cause of harm to Mitchell.  Noregon knew, should have known, and/or reasonably could have foreseen that its conduct would cause Mitchell to suffer loss of customers, loss of market share, and lost profit.

108.     Mitchell has been damaged in an amount to be determined at trial.

109.     On information and belief, Noregon's above acts of unfair competition are willful and intentional, thus entitling Mitchell to an award of treble damages and attorney's fees.

**COUNT VII**
**<u>TORTIOUS INTERFERENCE WITH A CONTRACT</u>**

110.     Mitchell repeats each and every allegation of the preceding paragraphs as if set forth fully herein.

111. The SIA Agreement between Mitchell and Noregon was entered into for good and valuable consideration.

112. Under the Agreement, the parties agreed that Mitchell would enter into a EULA contract with each end user of its REPAIR-CONNECT system, including all end users accessing REPAIR-CONNECT through Noregon's JPRO diagnostic tools and software.

113. Noregon knowingly entered into and has knowledge of Mitchell's EULA contract with the end users of the combined JPRO-REPAIR-CONNECT diagnostic system.

114. Noregon intentionally induced end users to terminate and/or cancel Mitchell's EULA contract with its end user customers by switching from Mitchell's REPAIR-CONNECT system to Noregon's Next Step system under the guise of a software update, and thus tortuously interfered with Mitchell's contract with its customers and/or licensees.

115. Noregon's actions were not justified or subject to any judicial exceptions.

116. Noregon's inducement of the end users to violate the EULA contract was the proximate cause of injury to Mitchell in the form of lost customers, lost market share and lost profits.

**JURY DEMAND**

Mitchell demands a jury trial as to all issues that are triable by a jury in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Mitchell prays for the following judgment and relief against Noregon:

(a)     That Noregon is liable for direct and/or indirect infringement of one or more claims of the Patent-in-Suit, as alleged herein;

(b)     That Noregon and its parents, subsidiaries, affiliates, successors, predecessors, assigns, and the officers, directors, agents, servants and employees of each of the foregoing, and

20

those persons acting in concert or participation with any of them, be enjoined and restrained from continued infringement, including but not limited to making, using, selling, or offering for sale within the United States, or importing into the United States, any products or services that infringe the Patent-in-Suit prior to its expiration, including any extensions;

(c)     An award of all damages adequate to compensate Mitchell for the infringement that has occurred, pursuant to 35 U.S.C. § 284, including lost profits, but in no event less than a reasonable royalty, plus prejudgment and post-judgment interest;

(d)     An award of treble damages for willful infringement pursuant to 35 U.S.C. § 284;

(e)     That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Mitchell be awarded attorney's fees, costs, and expenses incurred in connection with this action;

(f)     An award of actual and compensatory damages arising from Noregon's breach of the SIA Agreement;

(g)     An award of injunctive and/or equitable relief, pursuant to Paragraph 5.4 of the SIA Agreement;

(h)     An award of Noregon's profits attributable to Noregon's misrepresentations, false advertising and unfair competition pursuant to 15 U.S.C. § 1117;

(i)     An award of damages pursuant to 15 U.S.C. § 1117 sufficient to compensate Mitchell for Noregon's misrepresentations, false advertising and unfair competition;

(j)     An award of treble damages for Noregon's willful misrepresentations, false advertising and unfair competition pursuant to 15 U.S.C. § 1117;

(k)     That this case be declared an exceptional case within the meaning of 15 U.S.C.

§ 1117 and that Mitchell be awarded attorney's fees, costs, and expenses incurred in connection

with this action;

(l)     An award of damages, including Mitchell's lost profits, sufficient to compensate

Mitchell for Noregon's violation of N.C. Gen. Stat. § 75-16;

(m)     An award of treble damages for Noregon's unfair and deceptive trade practices,

pursuant to N.C. Gen. Stat. § 75-16;

(n)     That Mitchell be awarded reasonable attorney's fees incurred in connection with

this action pursuant to N.C. Gen. Stat. § 75-16.1, plus any costs and expenses this Court deems

just and proper;

(o)     An award of damages sufficient to compensate Mitchell for Noregon's tortious

interference with Mitchell's contracts with its end user customers, and any trebling or enhanced

damages and attorney's fees available under the law;

(p)     Directing Noregon to pay all costs incurred by Mitchell related to this action; and

(q)     An award of any further relief that this Court deems just and proper.

Respectfully submitted,


By:     /
        Allen R. Baum
        BRINKS GILSON & LIONE
        4721 Emperor Boulevard
        Durham, NC 27703
        Tel: (919) 998-5700
        abaum@brinksgilson.com
        NC Bar No. 24868


Dated: June 13, 2018

James K. Cleland
BRINKS GILSON & LIONE
524 S Main St. – Suite 200
Ann Arbor, Michigan 48104
Tel: (734) 302-6000
jcleland@brinksgilson.com

Gary M. Ropski
Daniel A. Parrish
BRINKS GILSON & LIONE
NBC Tower – Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
Tel: (312) 321-4200
gropski@brinksgilson.com
dparrish@brinksgilson.com

*Counsel for Plaintiff Mitchell Repair
Information Company, LLC*